grandson, Barack Obama. Monette Sacameno v. U.S. Bank National et al., Case No. 19-1569. First Mr. Metlitsky. Thank you, Your Honor. Anton Metlitsky for the appellants, and may it please the Court. This case arises from significant negligence in the servicing of a single $135,000 loan. The jury awarded $582,000 in compensatory damages, one of the highest single loan awards in Auckland's history, and the District Court subsequently awarded an additional $750,000 in attorney's fees. We're not challenging either of those awards on appeal. We are, however, challenging the $3 million in punitive damages that the jury awarded under the Illinois Consumer Fraud Act, and we have a sufficiency of the evidence challenge and a due process challenge, and I'll start with sufficiency, if I could. Illinois law, as this Court has repeatedly recognized, has a, quote, strong aversion to punitive damages and allows them only in extraordinary and exceptional circumstances. And most relevant here, it requires two showings. First, outrageous conduct similar to that usually found in crime, and second, direct participation by corporate or management-level employees. I'll start with direct corporate participation because the appellee's only argument there is a claim of waiver, which is clearly wrong. The District Court obviously reached the merits of this argument because it was fully presented below, but the Court was simply incorrect on the merits in upholding the punitive award because there was no evidence at all of management-level knowledge of the conduct at issue. What's your response on ratification, then? So ratification is the only theory at issue here for direct corporate participation, but ratification generally requires management-level knowledge of the actual conduct. The main case is a case called Progress Printing, which is 601 Northeast 2nd at 1067, and the case is that normally a principal's actual knowledge of the transaction is essential, and there is no evidence at all of any management-level knowledge of the actual conduct here. There is an exception, a narrow exception, one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be treated as though they had known the facts for purposes of ratification, but again, there is no evidence at all that management's failure to learn the facts of the servicing of this single loan was based on gross negligence or culpable negligence. There was no evidence about that either way, and so... When did Ackwin first learn that a mistake had been made, or first acknowledge it? So I believe in August of 2013, the original mistake, what was referred to in trial as Marla's mistake, was corrected, and $1,600 in... But there were a lot of subsequent mistakes from that. Well, I think it would all basically stem from one mistake, which was the negligent recording. Let me rephrase it then. When did Ackwin first acknowledge that mistakes had been made with respect to the plaintiff here? Well, as I said, the acknowledgment of the first mistake was August of 2013. I think they didn't figure out that the remaining conduct was mistaken until suit was filed in February, I believe, of 2015. Did they figure it out then, or it seemed like from the trial evidence, with respect to the question on whether or not the last two payments had been made, that they didn't figure that out until the woman was testifying on the stand. That seems to be true, but they stopped sending the delinquency notices in February of 2015. But of course, none of that has anything to do, first of all, with whether any management-level employee had any knowledge or was grossly negligent in failing to learn the facts, because there was no evidence offered of, for example, what kind of loan servicing errors would be elevated to the management level. I mean, they could have introduced that kind of evidence. But could an inference be drawn here that once the lawsuit was filed, that certainly somebody in management knew? Oh, yeah, but once the lawsuit was filed, the delinquency notices stopped. And so I think that was the end of the ICFA conduct. So the fact that they may not have figured out that the actual planned payments had been made until trial wouldn't impact that analysis? I don't think so, because the conduct at issue stopped, right? The conduct that resulted in the punitive damages award. Now, setting aside management knowledge, which we think is enough to resolve the sufficiency challenge, there's also the point of the mens rea requirement, which is a very high standard in Illinois. It requires evil motive or conscious disregard of the rights of the plaintiff. And in this case, the evidence is just that everything was based on good faith reliance on negligently kept records. And I think the best- You weren't trying to argue, and I'm sorry to interrupt, but to pick up on what you just said, the district court in ruling relied on a deliberate indifference theory. In your briefing, you seem to resist wanting to cast things in a deliberate indifference argument. Are you saying you don't think deliberate indifference satisfies the mens rea requirement for that? Or do you agree it does? It does. It does, except that, I'm quoting from the Lloyds case in the Illinois Supreme Court, that deliberate indifference or reckless indifference in Illinois approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it. And I would point the court to the Cruthers case. This is a 2004 case from the Illinois Appellate Court, which is really on all fours here. In that case, a bank incorrectly withdrew one of its customers' funds from its deposit account. The customer, in fact, overdrew the account, withdrew more funds than the customer had. They didn't notify the customer. When the customer found out, because she was charged an overdraft fee, she went into the bank, talked to a manager, filed an affidavit explaining that the withdrawal was improper. The bank admitted that they never looked into whether the withdrawal was proper or not, and didn't return either the deposit or back out the fees, the overdraft fees, until she sued them. And the court held that the bank was certainly liable for conversion, but that it was just not a punitive damages case under Illinois law, because there was no evidence of evil intent or the reckless indifference equivalent. So for those two reasons, again, we think this is not a punitive damages case under Illinois law. But if you disagree with that, certainly we think under the due process analysis, the $3 million award here should be substantially reduced. And the most obvious error below is the ratio analysis. Before we go there, one more question, please, on the ratification question. Is there any evidence that your client made any effort to change its procedure so this kind of mistake wouldn't happen again? You mean after the fact? Correct. After it learned of the problem. Well, after it learned of this particular problem? Correct. So that it wouldn't happen to other customers. I'm not sure if there's record, I'll get back to you on rebuttal whether there's record evidence. I'm sure they did, but I don't know if it's in the record. Okay. And I'm sorry, go to the rebutter. Yeah. So on the due process challenge, the district court's main legal error here was the ratio analysis. And the ratio analysis obviously is going to depend in part upon the aggregation or not. Well, that's the error. And can you speak to us, your position with regard to where you think our court should go on aggregation and why? So first of all, I don't think the court should even reach the question because they waived it in their appellate brief. They said the court shouldn't resolve it because they think they have two other arguments on which the district court's judgment should be affirmed. But if the court did reach it, it seems to me fairly obvious that in a case like this, where the jury is specifically asked, on the one hand, find actual damages that result from the one claim that allows for punitive damages. And on the other hand, find actual damages on the other claims that do not allow for punitive damages. When you're trying to figure out in the due process punitive damages analysis what the actual harm is, you have to look at the jury's verdict and see what they thought the actual harm from the CFA claim was, not for the claims where Congress has said punitive damages are not allowed. So this is the argument on page 13 of your reply brief. Are you grounding it in the discussion that happened at the verdict conference and or the law as it flows from the different circuits? I think it's a legal argument that, again, I don't think they actually dispute. And so I don't think the court needs to resolve it in this case. It doesn't result from the colloquy between counsel and the district court judge, except insofar as that colloquy just confirms what the verdict form already reflects, which is that the jury was specifically going to be asked separately to decide what the compensatory damages are under the CFA and what the compensatory damages are under the FDCPA and RESPA and the breach of contract claim. And I think what counsel is saying, I think I'll be better able to respond after he explains the argument, but I think that the agreement that he's relying on is that the two different compensatory damage verdicts will be added together, as opposed to viewing the ICFA verdict as a subset of the general damages amount. Of course that's true, but it supports us because it just further demonstrates that the ICFA damages are separate and apart from the damages from the other counts. That's why you can add them together, right? Because the jury decided what the actual harm was under the CFA separately from the other counts. And in that circumstance, at least, I don't see any argument for comparing the punitive what Congress has said, that no punitive damages are allowed. It just seems to me a complete non sequitur. Judge Lepar and Fastall talks about the commonality behind the conduct. Right. And he's looking to aggregation in that Fastall case as an example of, we've got common conduct here, why wouldn't we include that as part of the ratio? What's your response to that? Two points. First of all, in Fastall, both claims could result in punitive damages and did result in punitive damages in that case. In this case, it's very different because here, Congress has precluded punitive damages for injuries that result from the FDCPA and from RESPA. And Illinois has precluded punitive damages for breach of contract. So that seems to me like a dispositive difference. But the other problem is, I think Judge Lepar was, with respect, misreading the TXO case because he was relying on the proposition that you could look at the Supreme Court held, and you could look at potential harm, and not only actual harm in the ratio analysis. But at least in this case, I'll reserve after I just finish answering this question. In this case, there's no reason to think that the $500,000 that were awarded under these separate statutes have anything to do with potential harm from the FDCPA. So I'll reserve the balance of my time and get to the ratio itself. Thank you, Mr. Metlitsky. I will now hear from Mr. Wooten. Thank you, Your Honors. The issue in this case is that all the conduct that Mr. Metlowski would like to excuse on appeal was undertaken in violation of the bankruptcy discharge injunction. And it was knowingly done. And that was an admitted fact throughout the trial. Judge St. Eve, you mentioned, when did Occoquan acknowledge they made a mistake? They acknowledged it when I laid those printouts of the patent history, their printouts, in front of Gina Feser and made her count to 42. It kind of became a joke in the case, you know, towards the end. It's like every trial lawyer's dream, right? Yeah. It's like, I couldn't believe it. On the stand. Yeah. It's like, can I help you count to 42? And she literally messed up the counting two or three times. I had to go back and correct her. So she had trouble doing it with me helping her. And it was kind of indicative of my client's experience with Occoquan. Mr. Wooten, what evidence is there that anyone in management knew this? So, Your Honor, here's where I take that. Court orders are commands to a corporation. And that includes the discharge injunction as well as the consent decrees. And I cite a case, it's a Seventh Circuit case, the Reich versus the Seaboat, the Seasprite Boat Company. And that case cites to the Wilson case from the Supreme Court from 1911, which says that an order to a corporation is binding on those who are responsible for its effects. Now, if you look at what's 360. So are you saying that the best evidence of management knowing would be the Well, that would be the first trigger of knowledge, Your Honor. And if you look at what was 364 in the supplemented record, which was Exhibit 44 on the very last page of that exhibit, it said Occoquan's inadequate infrastructure and ineffective personnel have resulted in Occoquan's failure to fulfill its legal obligations. Are you reading from a consent decree? Right. And then it said Occoquan did not take adequate steps to implement reforms that it was legally obligated to implement pursuant to the 2011 agreement. So that agreement in 2011, the original agreement with Occoquan's management was that they would cease to utilize this technology and they would train their personnel, which they failed to do. And at the point in time that Ms. Sacramento ran into this buzzsaw, that had been a standing condition for multiple years. In fact, this very same conduct was the conduct that led to the second consent decree with U.S. government in all the states except Oklahoma that we marked as Exhibit 363. And those standards became what we now refer to as the National Mortgage Servicing Standards that were imposed on Occoquan, among others. Other than the consent decrees, is there any evidence that was admitted that the management here knew about your clients' issues? Certainly the line employees who were making mistakes left and right and serious mistakes for your client, there's evidence of that. But is there any evidence that anyone in management knew of the particular mistakes here aside from the consent decrees that put them on notice about some of their problems? If you look at paragraph 33 of the facts that I recited from the record, since there weren't very many in the appellant's brief, there is a direct quote from the notes log, and it comes from the department that determines what happens when a legal inquiry under RESPA is made. And what had happened is Ms. Sacramento had written into Occoquan and had said, you've messed this up. I've made all my payments, I've got a discharge, and you're telling me that you're fixing the foreclose. And that would have been her second time sending the information since her question was entered. And in that entry, Occoquan's, whomever that was, it was the person who made the decision about how Occoquan would respond. They specifically refused to raise the bankruptcy discharge flag on the basis that Ms. Sacramento had made 40 and not 42 planned payments. And is there any evidence in the record as to the person who made that note, if that individual was line employee versus management? No, ma'am. The issue with that is this. The way Occoquan's system works, they split that out among several departments, but there's an ultimate decision-making department that deals with these written requests, notices of error, we used to call them QWRs. So that department tells everyone else what their response will be. So you can infer that that's management in the sense that they control their decision that collections continued beyond August of 2013, which Occoquan's corporate representative acknowledged that had that been responded to appropriately at that moment, that was at that point about the fourth chance Occoquan had to stop this nightmare. And at that point, they made a deliberate choice that there were 40 and not 42 payments. And so we will not raise the bankruptcy discharge flag. And then, of course, it continues to spiral out of control. Now, to your question, Your Honor, no. I cannot tell you that that is signed by X person manager because it just does not have that. But it was testified that that was the part of the company that told everyone else what they would do with respect to that issue. So that was the testimony. All right. Thank you. So may I, if I can, Your Honor, let me address this issue with respect to, I think it's sort of a neat move that Mr. Metlovsky did here with these consent decrees. Occoquan fought like the Dickens to keep them out in the lower court. And then they challenged them post-trial in their motions for new trial judgment as a matter of law on the grounds that they were evidence of corporate complicity, but they should have been excluded. And they made that reference specifically in their post-trial motions at 312 and 314. In 314, it was at page 13. In 314, it was at page 7. So what they said is, yes, this is evidence, but you shouldn't consider it. It shouldn't have been admitted. So they had acknowledged in the trial court that if it was properly admitted, then there was evidence. But now on appeal, they say there is no evidence of corporate complicity. But they dropped their evidentiary challenge to these consent decrees. And I think the reason for that is very much strategic. They do not want a circuit-level opinion talking about the contents of these consent decrees and the fact that they are admissible, which, as you all know, the standard of review for evidentiary, it would be almost impossible for them to overcome. So they knew that that was trying to run their head through a brick wall. And they didn't want a bad opinion that focused on those consent decrees because it would be damaging to their national litigation. So they abandoned the actual challenge, but they've kept the argument. And in my opinion, that's improper. If you say in the lower court that that was evidence of complicity, but then you come to the appellate court and you don't continue your challenge to that evidence, you can't then say that there's no corporate complicity. So at the point in time that Ms. Sacamino was dealing with this issue, you have a corporation that was under court order in multiple places to do certain things they were not doing and refused to do. And so what happened was the jury did hear those things. We talked about the New York consent decree, and we talked about specifically the fact that AQUIN would not honor their legal obligations under that decree, and that there were millions of consumers forced to deal with AQUIN because consumers don't get to choose their mortgage servicer. Their mortgage servicer is imposed upon them by the owners of the debt who they contract with to do that job. So Ms. Sacamino couldn't go online and say, I'd rather have Bank of America be my servicer. She was stuck with whatever AQUIN wanted to do to her, and she has been, and she's been in this limbo for years where they've continued this unbelievable behavior, which is not contested. I mean, they admitted this, and even in their brief, they said that their conduct was unacceptable and it clearly should not have been done, and that Ms. Sacamino was harmed. So they've acknowledged all those points, but then they've turned around and said, even though the ICFA claim had the same burden of proof as with respect to what had to be proven by preponderance of the evidence, and the jury was charged on what was required to find punitive damages were appropriate, they say that, well, we admit we did this, but there's just not enough there. And quite frankly, for me, it doesn't pass the logic test. How can you not oppose the verdict itself on the sufficiency of the evidence, but then say that the jury that made the same decision that you violated the ICFA made a separate and wrong decision about whether your conduct was egregious enough to warrant punitive damages? You know, we always say that we trust juries to follow the instructions they're given and apply the law to the facts. And this jury was an exceptionally well-educated jury. Our foreman was a civil engineer. So this was not a situation where we had people that were just being led around by the whims of a plaintiff's law. I mean, they spent three days deliberating. So I don't think that this was a product of passion. I think it was a product of reason. And at the end of the day, the jury clearly had problems with Offman's conduct. Mr. Wood, let's talk about the issue of the aggregation and the ratio. Sure, Your Honor. Give us your position on that, please. Interesting. You know, I was at the trial. I tried the case. We were talking about competing verdict forms. I had the check the box, do you fine for my client on this count? And Judge Gottschall was fine with all that, and they were fine with all that. And then we got down to the damages form, and I had a line for compensatory impunity. That was it. So they said that because it requires a finding of economic harm, we want a line where the jury has to write in economic damages. And, you know, Judge Gottschall said immediately, I think that's proper. I think they should do that. I didn't disagree. I didn't see the issue with that. And so she looked at their verdict form. Now, the difference between their verdict form and mine is they had split out that economic damages in one place, and they had also put up a line in the form that was submitted to the court. They put up a line that said compensatory damages under those three counts. And then down at the bottom, and then we had the separate lines at the bottom for punitives, if appropriate. So as we're talking about what to do with that issue, Judge Gottschall says, Mr. Bono, how are we going to treat this? So I need to know how we would treat this if there's a verdict return. So are you saying that this line would be deducted, or would it be added, or what are we doing? And so Mr. Bono said, we'll add the lines. And so when he said that, I responded. I said, so I think what he's saying, Your Honor, is that if there's an award on this line, an award on this line, we're going to add those up, and that's going to be total compensatory damages. And Mr. Bono said, that's right. So based on that, we were talking about proceeding that way. And then he said, I also want to add a line for non-economic under ICFA. So I said, OK. And his associate brought up the little form that had that on there and he handed it to me to look at. And I'm standing here. Judge Gottschall's there. He's at the table. And I looked at it. And so I walked over to the table, and I said, Lex, so what you're saying is we're going to add these three lines together, and that's going to be the total award. He said, yes. Well, that was me and him talking at the table, because we were colleagues and had been working well together. So I walked back to the lecture, and I said, based on our conversation and what you've indicated, Your Honor, we're fine with this form. We'll just use this form. Could I have gone deeply into depth and said, we have agreed that we will aggregate damages at the end of the I mean, yes. There was more I could have said. But the three of us standing there knew what we were doing. And so we walk away, and they use the form. And, of course, I explain the form to the jury. And I noted this in the brief. I was the only person that discussed the form. I said, this is how you fill out the form. You take whatever you're going to award for compensatory damages, and you split it up among these lines. And you've got to put a number in for economic, because that's a prerequisite. No one challenged that. No one disputed it. When Aquin stood up in closing, they said, we're supposed to win and give them zero. So I was the only person who gave the jury any instructions about the form. So when we came back to that, you know, the verdict form came back like it did. And I walked out of the courtroom thinking it was no issue, because we'd agreed to add the lines. And then, of course, the post-trial motions came out, and it was a different story. And I felt like I'd been a little bit bushwhacked by that. It definitely went against the spirit of what we'd agreed to. And that was the purpose of my motion or my arguments on that point, was that, you know, we are lawyers in trials, and you all have been trial judges. You know what it's like. You're in that courtroom, and you're pounding it out. And people have to make decisions on the fly. I don't understand the challenge to be to the verdict form, though. What they're arguing is the amount of punitive damages, if they lose on the first point, that punitive shouldn't be awarded in the first place, that we should reduce the amount of punitive damages to a lower number, focusing only on the amount of damages awarded on the verdict form, on the ICFA, ICFDPA, because that's the only statute that permitted the award of punitives. Right. And if you read their brief, they admit that all the conduct that was subject to the verdict was the same. It was all the same conduct. But how do you address the question that only one of the statutes that you won on allows for punitive damages? So, in determining the appropriateness of punitives, defendant has argued that you should only look at that particular statute. You can't look at all of them, because the awards on the other ones don't allow for punitive damages. And so, my legal position on that is the circuit precedent is clear. I think it's a Thomas versus Cook County case that we noted that said that a plaintiff in a lawsuit can have multiple theories of relief, but they only get one award of compensatory damages. And so, the award of compensatory damages in this case, even though it was divided among theories of relief, is still a single award of compensatory damages. And so, the conduct, as Judge Gottschall found, was all interrelated and intertwined. In other words, we could have gotten the whole $582,000 had we gone to the jury only on the ICFA. There was nothing in those damages that were awarded under the breach of contract or FDCPA or RESPA that could not have been part of a verdict under ICFA. But that's not what this jury verdict awarded. That's right. And so... So, how can you give... When you're assessing punitives and looking at the ratio, how can you include those, the awards under statutes that don't permit punitive damages? Aren't you going around what Congress has permitted if you do that? I don't think so, Your Honor. And here's why. I think if you look at the case law... My client has the Seventh Amendment right to have the jury determine her damages. We have case law that we cited that says that the duty of the court is to uphold the Seventh Amendment and to uphold the verdict. We have case law that says it is okay to accumulate damages when it reflects the intent of the jury. So, you also have intertwined conduct. And literally, we're all speculating about what may have happened just because the structure of the verdict form. But had the verdict form been flipped and the ICFA count been at the beginning and the other line been below, who knows, maybe the jury would have written $500,000 under the ICFA count. The jury was never told that there was a legal significance to that number. They were told, split up what you're awarding and these will be added together. Now, I mean, if that argument was there, I could have said, you have to put the biggest number down here because it's going to be compared to your punitive damages. But then that creates separate problems for us practically as trial lawyers because now we're trying to educate juries on ratios and guideposts, and that's not their job. So... What about on this issue, though, of the type of damages? Does the fact that these are emotional damages versus a machine that had cut off an arm and the company had been told six times, you got to put a guard on, there's not a guard on. Is the type of damages something that we should consider on that? Well, you know, I had made a point here to mention that the State Farm case, the Supreme Court case where they say that emotional stress has a punitive element, I made a point to mention that that's kind of a dip to comment and the fact of the matter is, the jury instructions, they're charged to separate compensatory and punitive damages. So, I can't see how you can say that there's a punitive element to an emotional distress award. There was substantial credible testimony that this event was devastating to my client. Her daughter said, my mother was absent when she got married, when she had her first child. She was absent. She was gone. Years of her life were taken away. It was significant. When you broke it down into hours, if you put it into 40-hour work weeks, it was the same number of hours that would go into a 20-year work career. And I think that slapped the jury in the face when you think about the magnitude of this. So, when you break that down, this was massively damaging to my client. It changed her entire outlook on life in general. She testified without contradiction to how severe it was and so did the supporting witnesses. Both of her children, Susan VanSky, one of her co-workers, a lady who's had a perfect work career, lost a job, first time in her life, in her 50s. Never lost a job, never even had a job question. So, it was truly a devastating experience for her. So, to diminish that by saying you should treat a portion of those damages as having a punitive element, it inserts the jury's work, is what it does, but it flies in the face of what we understand the instructions to be. And then one last point, which we really didn't get to, was the issue of whether the attorney's fees could be added to the denominator, which was my main argument, was that even if you say that what Mr. Metlofsky says is true, that you should only consider the $82,000. We mentioned the Blount v. Stroud case, and if you go to that opinion, and I'm looking at a non-Westlaw version, but it's cited from the Illinois government at page 25, there's a deep discussion of that issue specifically, and how Illinois state court has handled that with the ICFA, and it talks about the low excavating case, it cites to the Bedbug case, Mathias v. Acor Lodging, and it also mentions the other cases I cited, Continental Trend Resource, and all these stand for the proposition that if a case is vigorously defended and millions of dollars in time are expended to defend the case, that that is a relevant factor in the constitutional analysis as to the guidepost, and here, our discounted agreed fees through the trial were $750,000. We had more than a million dollars in time to get through trial. Auckland himself spent $800,000 between November of 2017 and the trial, and then, of course, we've had this much time more between post-trial and appeal. Speaking of time. Thank you, Mr. Wooten. I'm sorry, Your Honor. Thank you, Mr. Wooten. Thank you. Mr. Matloski. Thank you, Your Honor. Just a few points. First, starting on the question of management participation, the only evidence that counsel cited was the consent orders, but the consent orders actually have nothing to do with the division of responsibilities between management and employees, so there's just no evidence on that. They could have taken depositions as for discovery on it. They didn't. It's just a failure of proof. Mr. Wooten said the sufficiency of the evidence on liability should dictate the sufficiency on the evidence of punitive damages, but, of course, that's not true because there's a heightened standard for punitives in Illinois, and they're highly disfavored, so the two really are independent, and they failed to satisfy the higher punitive standard here. Now I understand that the agreement Mr. Wooten is talking about is that the lines for compensatories under the ICFA and the lines for the other damages would be added, which is right. That's why the damages are 582 and not 500, but the point is clear that the jury was asked specifically what the damages under the ICFA are. They found that they're $82,000. Mr. Wooten now says that he could have gotten 582 under that count, but I don't understand how he could possibly know that since the jury answered that question. It's true that the jury was never told of the legal significance of the division of compensatory damages, but, of course, that's a question for the court, not the jury. The jury would never be told about something like that, a due process analysis. So the jury wasn't told that it could only award punitives on that count? Yes, it was told that. The jury was told that it could only... It's precisely right. The jury was told that only the ICFA allowed for punitive damages. So if you look at the verdict form, which is on, I believe, 202, 203, the ICFA is last. Correct. Right. So on this attorney's fees point really quickly, that wasn't raised below, so it's waived. It's incorrect for the reasons we explained under BMW against Gore. And I think, if anything, it would go the other way because, after all, the point of the due process analysis is that you shouldn't have punitive damages higher than necessary to deter. And when, in the extraordinary case, there's fee shifting, such that there's beyond compensatory damages, you have attorney's fees that are themselves meant to deter a lower punitive damages amount rather than a higher punitive amount is what's required. And I didn't get to talk about what we think the ratio itself should be. I gave Mr. Wooten some extra time, so why don't you take two minutes? Sure. So we think the ratio should be one-to-one under the general principle that substantial punitive damages generally lead to a one-to-one ratio, plus the statement in State Farm, and it's not just in State Farm. Many other cases, I'll point you to pages 26 to 27, of the chamber brief make clear that when there's a substantial emotional distress amount, the ratio should be lower, everything else be equal, because emotional distress damages have a punitive component. And finally, in the reprehensibility analysis itself, what the Supreme Court is asking courts to do is look at the spectrum of cases where punitive damages is warranted and figure out where on the spectrum the particular case falls. And in this case, on the spectrum of cases, it falls nowhere close to the outer limit. There's no physical harm. There aren't a lot of victims of the same conduct. The evidence in the case was that there's no evidence that anything like this had happened to anybody else. The case doesn't involve health and safety. And so when you're comparing it to cases like companies selling products to thousands of people that they know are going to cause injury or the bed bug case where the hotel is renting rooms to thousands of people instead of just bringing in an exterminator, this kind of case, which we submit, of course, is negligent record-keeping, is nowhere close to the kind of case that's going to warrant a high punitive damages ratio. Thank you, Mr. Manalitsky. Thank you, Mr. Wooten. The case will be taken under advisement. Thank you.